UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PROGRESSIVE AMERICAN INSURANCE
COMPANY,

        Plaintiff,

v.                    Case No. 8:13-cv-2171-T-33AEP

PAUL STEELE, GRAHAM STEELE,
and DOROTHY MAE MURPHY-SMITH,

        Defendants.
_____/

**ORDER**

This cause comes before the Court in consideration of Plaintiff Progressive American Insurance Company's Motion for Entry of Final Summary Judgment (Doc. # 26) filed on January 9, 2014. Defendant Dorothy Mae Murphy-Smith filed a response in opposition to the Motion (Doc. # 33) on February 10, 2014. Progressive filed a reply (Doc. # 34) to Murphy-Smith's response on February 14, 2014. For the reasons that follow, the Motion is granted.

## I.   **Background**

On May 4, 2011, Dr. Paul Steele signed an application for personal umbrella insurance with Progressive. (Dedrick Aff. Doc. # 26-1 at 3). The next day, Progressive issued to Dr. Steele a personal umbrella policy for the policy period

of May 10, 2011, to May 10, 2012, under Policy No. 45855372-0. (Id.). That policy listed Dr. Steele as a "named insured" and reflected a "rated" status for Dr. Steele's son, Graham. (Doc. # 26-2 at 3).

According to Progressive Product Analyst Brian Dedrick, "[i]n March 2012, Progressive prepared for the policy's renewal by performing its standard underwriting review. At that time, Progressive determined that there were several serious traffic violations on Graham Steele that made the umbrella policy unacceptable for renewal." (Dedrick Aff. Doc. # 26-1 at 3). Consistent with this determination, on March 7, 2012, Progressive mailed to Dr. Steel a non-renewal notice. (Doc. # 26-2 at 5). The non-renewal notice stated succinctly: "Your personal umbrella policy will expire at 12:01 a.m. on May 10, 2012. You will not receive an offer to renew because: The number of violations/accidents listed on policy exceeds the acceptable limit. If you have any questions, please call your agent." (Id.).

Dr. Steele acknowledges receiving the non-renewal notice in the mail at his home. (Steele Dep. Doc. # 27 at 7). Furthermore, Dr. Steele understood that the "violations/accidents" mentioned in the notice referred specifically to citations received by his son, Graham. (Id.

2

at 9).  Upon receipt of the non-renewal notice, Dr. Steele contacted his insurance agent, Ryan Clegg.  (Id.).

When Clegg became aware of the non-renewal notice, he "called Progressive to find out what was going on." (Clegg Dep. Doc. # 28 at 8).  Progressive informed Clegg that, due to Graham Steele's driving record, Progressive would not renew its policy with Dr. Steele.  (Id. at 8-9).  Clegg recalls that he "negotiated terms where we could keep the policy in force with Progressive, pending Graham was excluded from the umbrella policy." (Id. at 9).  Clegg then communicated to Dr. Steele that "[t]here was no other way to continue umbrella coverage unless Graham was excluded." (Id. at 11).  Furthermore, Clegg explained to Dr. Steele that no coverage would be afforded to Dr. Steele himself "should something happen while Graham's on the road." (Id. at 12).

Based on this conversation with Clegg, Dr. Steele understood that the only way to continue umbrella coverage with Progressive was to exclude Graham as a driver on the policy.  (Steele Dep. Doc. # 27 at 10; Doc. # 27-1 at 10).  Because he wanted to continue the umbrella policy with Progressive, Dr. Steele authorized Progressive to write the umbrella policy for the next policy term excluding Graham as a driver.  (Steele Dep. Doc. # 27 at 10; Doc. # 27-1 at 10-

3

11).  Dr. Steele maintains, however, that he misunderstood the implications of excluding Graham as a driver; Dr. Steele understood "that Graham was gonna be excluded, so he wouldn't be covered under the umbrella," but Dr. Steele nonetheless thought that he personally "was still covered under the umbrella." (Steele Dep. Doc. # 27-1 at 7).  Dr. Steele offers no explanation as to the basis for this assumption.  (Id. at 7-8).

"Pursuant to Progressive's producer agreement with its agents, in order to exclude a named driver from coverage, the agent is required to secure a signed copy of the Named Driver Exclusion Election from the policyholder and maintain a copy in their files."  (Dedrick Aff. Doc. # 26-1 at 4).[1]  Clegg accordingly "had [Dr. Steele] sign an exclusion form." (Clegg Dep. Doc. # 38 at 8).

In conjunction with obtaining the signed exclusion form from Dr. Steele, Clegg "utilized Progressive's electronic quoting application, wherein he indicated that [Graham Steele] was to be excluded from coverage," in order to secure a replacement policy.  (Dedrick Aff. Doc. # 26-1 at 3-4).

---

[1] However, "Progressive does not require that the original signed Named Driver Exclusion Election, or a copy thereof, be provided to Progressive in order to exclude a driver from coverage."  (Dedrick Aff. Doc. # 26-1 at 4).

4

In accordance with Clegg's use of Progressive's software (Id. at 4), Progressive issued a personal umbrella insurance policy under Policy No. 66613589-0 ("the Policy") to Dr. Steele for the policy period from May 10, 2012, to May 10, 2013 (Policy Doc. # 26-3 at 2).  The Policy listed Dr. Paul Steele as the "named insured" and Graham Steele as an "excluded" driver.  (Id. at 3).  The Policy additionally contained a "Named Driver Exclusion Endorsement" which provided as follows:

> If **you** have asked **us** to exclude any person from coverage under this policy, then **we** will not provide coverage for any claim arising from an accident or loss involving a motorized vehicle being operated by that excluded driver.  This includes any claim for damages made against **you**, a **relative**, or any other person or organization that is vicariously liable for an accident arising out of the operation of a motorized vehicle by the excluded driver.

(Id. at 9) (emphasis in original).  Progressive mailed the Policy to Dr. Steele on May 12, 2012.  (Dedrick Aff. Doc. # 26-1 at 5).

On September 12, 2012, Graham Steele allegedly was operating Dr. Steele's 2008 Jeep Commander, a vehicle insured under the Policy, when he was involved in a motor vehicle accident with Dorothy Mae Murphy-Smith ("the Accident").  (Doc. # 1 at ¶ 13).  Murphy-Smith allegedly attempted to

settle with Progressive under the Policy "based on the alleged negligence of Graham Steele and the vicarious liability of Paul Steele as the owner of the motor vehicle operated by Graham Steele." (Id. at ¶ 14).

Progressive consequently initiated this declaratory judgment action, in accordance with the federal Declaratory Judgment Act, 28 U.S.C. § 2201, on August 22, 2013, requesting that the Court enter a declaratory judgment finding: (1) that the Policy does not provide bodily injury liability coverage to Dr. Paul Steele or Graham Steele as a result of the Accident, (2) that Progressive has no duty to indemnify Dr. Steele or Graham Steele for any damages claimed by Murphy-Smith, and (3) that, should Murphy-Smith file a separate action as a result of the Accident, Progressive has no duty to defend Dr. Steele or Graham Steele in that action. (Doc. # 1 at 5-6).

On January 9, 2014, Progressive filed the instant Motion for Entry of Final Summary Judgment. (Doc. # 26). Murphy-Smith filed a response in opposition to the Motion (Doc. # 33) on February 10, 2014. Progressive filed a reply (Doc. # 34) on February 14, 2014. The Court has reviewed the Motion, the response, and the reply, and is otherwise fully advised in the premises.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)).  A fact is material if it may affect the outcome of the suit under the governing law.  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).  The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "When a moving party has discharged its burden, the non-moving party must then 'go

7

beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)).

However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981), cert. denied, 456 U.S. 1010 (1982).

8

## III. **Discussion**

### A. **Justiciable Controversy**

"In all cases arising under the Declaratory Judgment Act, 28 U.S.C. § 2201 . . . the threshold question is whether a justiciable controversy exists." Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co., 68 F.3d 409, 414 (11th Cir. 1995). "For a controversy to exist, 'the facts alleged, under all the circumstances, [must] show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" Id. (quoting Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941)). "The party who invokes a federal court's authority must show, at an 'irreducible minimum,' that at the time the complaint was filed, he has suffered some actual or threatened injury resulting from the defendant's conduct, that the injury fairly can be traced to the challenged action, and that the injury is likely to be redressed by favorable court disposition." Atlanta Gas Light, 68 F.3d at 414 (citation omitted).

In the Complaint, Progressive characterizes its dispute with Murphy-Smith as a "demand for settlement" rather than describing an underlying tort action by Murphy-Smith

9

regarding the Steeles' liability.   (Doc. # 1 at ¶ 14).
Additionally, in Progressive's Motion for Summary Judgment,
Progressive requests a declaration that, "*should a lawsuit be
brought* by Dorothy Mae Murphy-Smith for her damages as a
result of the Accident, [   ] Progressive, pursuant to the
Personal Umbrella Policy, has no duty to defend Paul Steele
or Graham Steele in that lawsuit."   (Doc. # 26 at 13)
(emphasis added).   Progressive also seeks a declaration as to
its duty to indemnify the Steeles for damages claimed by
Murphy-Smith.   (Id.).   Neither party has indicated to the
Court that an underlying tort action exists between Murphy-
Smith and the Steeles.   As a corollary, neither party has
briefed the Court on the issue of whether the dispute in this
case is ripe for adjudication.

However, the Court finds that Progressive's declaratory
action meets the justiciable controversy threshold in that
(1) the parties' adverse legal interests can be identified
from the pleadings, (2) Progressive suffers a "threatened
injury" of sufficient immediacy as a result of Murphy-Smith's
settlement demand, and (3) Progressive's injury is likely to
be redressed by favorable court disposition.   Indeed, the
Eleventh Circuit has explained that finding a case or
controversy in a declaratory judgment suit may require

entertaining the action "on a somewhat hypothetical set of facts." GTE Directories Pub. Corp. v. Trimen Am., Inc., 67 F.3d 1563, 1569 (11th Cir. 1995) In GTE, the Eleventh Circuit explained that

> in some instances a declaratory judgment is proper even though there are future contingencies that will determine whether a controversy ever actually becomes real. The familiar type of suit in which a liability insurer seeks a declaration that it will not be liable to indemnify an insured person for any damages the injured person may recover against the insured is an example. *The injured person may not sue or he may not obtain a judgment against the insured, but there is held to be sufficient controversy* between the insurer and the injured person that a declaratory judgment is permissible.

Id. (emphasis added).

Consistent with this analysis, the Court finds that exercising jurisdiction over this declaratory action is permissible under the circumstances of this case.

**B.   Duty to Defend and Indemnify**

Under Florida law, which the Court applies in this diversity action,[2] the duty to defend is broader than the duty to indemnify. Sinni v. Scottsdale Ins. Co., 676 F. Supp. 2d

---

[2] The parties do not dispute that Florida law should govern the issue of coverage in this case. (See Doc. # 26 at 9; Doc. # 33 at 2).

1319, 1323 (M.D. Fla. 2009).   The decision of whether an insurer has a duty to defend "is determined solely by the claimant's complaint if suit has been filed."   Higgins v. State Farm Fire & Cas. Co., 894 So. 2d 5, 9-10 (Fla. 2004).

However, as explained above, Murphy-Smith has not yet filed suit for her damages relating to the Accident.   "The Florida Supreme Court has recognized there are some exceptions to the general rule that the duty to defend is determined solely from the allegations of the complaint: [For instance,] 'there are some natural exceptions to this standard where an insurer's claim that there is no duty to defend is based on factual issues that would not normally be alleged in the complaint.'"   Composite Structures, Inc. v. Continental Ins. Co., No. 12-15866, 2014 WL 1069253, at *3 (11th Cir. Mar. 20, 2014).

In contrast to the duty to defend, the duty to indemnify is not determined by reference to the claimant's complaint, but rather by reference to the actual facts and circumstances of the injury.   Underwriters at Lloyds London v. STD Enters., 395 F. Supp. 2d 1142, 1147 (M.D. Fla. 2005).

Additionally, with regard to the duty to defend and duty to indemnify in Florida, the Court is mindful that

the timing determination as to whether a

12

> declaratory judgment action on liability insurance coverage should precede the underlying tort action against the insured is within the sound discretion of the trial court because there is too infinite a variety of circumstances for there to be a rule applicable in all cases.  The court should weigh the need to resolve the insurer's duty to defend, the possibility that proceeding to a decision as to the insurance indemnity issue will promote settlement and avoid the problem of collusive actions between claimants and insureds in order to create coverage where coverage does not exist, and the hardship of delaying the claimant's judgment against the insured with resources independent of insurance, along with the factors of the particular case.

19 Fla. Jur. 2d Declaratory Judgments § 32; see also Stonewall Ins. Co. v. W.W. Gay Mech. Contractor, Inc., 351 So. 2d 403, 403 (Fla. 1st DCA 1977) ("As against Stonewall's contention that suit . . . was premature because the insured's liability to the claimant is not yet established, the circuit court properly held that Stonewall's letters to the insured, unequivocally disclaiming coverage of certain of the claims, entitled appellee to declaratory judgment.").

In this case, neither party contests the Court's ability to declare coverage at this juncture.  The parties agree that, for purposes of this declaratory action, the narrow issue is whether coverage existed under the Policy on September 12, 2012, for an Accident involving Graham Steele.  Because the Court finds a justiciable controversy between the parties,

and because the Court finds that, under the unique circumstances of this case (discussed more fully below), the issue of coverage may be resolved without reference to the allegations of an underlying complaint, the Court will proceed to analyze the disputed contract terms.

Under Florida law,

> insurance contracts are to be construed in a manner that is reasonable, practical, sensible, and just . . . . Terms used in a policy are given their plain and ordinary meaning and read in the light of the skill and experience of ordinary people. Provisions that exclude or limit the liability of an insurer are construed more strictly than provisions that provide coverage.

United States Fire Ins. Co. v. Freedom Vill. of Sun City Ctr., 279 F. App'x 879, 880-81 (11th Cir. 2008) (internal citations omitted).   Furthermore, if provisions in an insurance contract are "reasonably susceptible of more than one meaning, they are ambiguous and construed in favor of the insured.   That rule applies if a genuine inconsistency, uncertainty, or ambiguity in meaning remains after a review of the plain language." Id. at 881.

## C.   **Relevant Policy Provision**

The Policy provides, in pertinent part, as follows:

**Named Driver Exclusion Endorsement**

If **you** have asked **us** to exclude any person from coverage under this policy, then **we** will not

14

> provide coverage for any claim arising from an accident or loss involving a motorized vehicle being operated by that excluded driver. This includes any claim for damages made against **you**, a **relative**, or any other person or organization that is vicariously liable for an accident arising out of the operation of a motorized vehicle by the excluded driver.

(Policy Doc. # 26-3 at 9).  The Policy listed "Drivers and household residents" as follows:

| | |
|---|---|
| Dr. Paul Steele | Named Insured |
| Leah Steele | Rated |
| Maila Steele | Rated |
| Evan Steele | Rated |
| Graham Steele | **Excluded** |

(Id. at 3) (emphasis added).

According to Progressive, summary judgment is appropriate because the Policy in effect at the time of the Accident specifically excluded Graham Steele as a covered driver and thus provides no coverage to Dr. Steele for Graham's alleged negligence in connection with the Accident on September 12, 2012.  (Doc. # 26 at 10).

Murphy-Smith does not dispute the meaning of the term "excluded" in this context. Rather, in response to the Motion for Summary Judgment, Murphy-Smith essentially argues that the "Named Driver Exclusion Endorsement" in the Policy should

not preclude coverage in this case, since Dr. Steele did not "ask" for Graham to be excluded as a driver. Rather, Murphy-Smith points to a statement in Dr. Steele's deposition in which he explains: "Progressive excluded him. I didn't ask them to exclude him. They made the statement that – they were the ones that were going to exclude him. Did I ask them to exclude him? No." (Doc. # 33 at 4) (citing Steele Dep. Doc. # 27 at 13).

Progressive counters that Dr. Steele "did ask Progressive to continue to provide umbrella coverage knowing that his son [Graham] was to be excluded as a driver. That is, for all practical purposes, the same as Dr. Steele asking Progressive to exclude his son from coverage under the Personal Umbrella Policy." (Doc. # 34 at 3).

Thus, the narrow issue presented by the parties for the Court's consideration is whether Dr. Steele "asked" Progressive to exclude Graham Steele from the Policy under the plain and ordinary meaning of that term based on the facts and evidence presented in this case. The Court finds that Dr. Steele's conduct in authorizing Progressive, through Clegg's use of Progressive's software, to write the Policy effective May 10, 2012, with the understanding that Graham would be excluded as a covered driver constitutes "asking"

16

for purposes of the Named Driver Exclusion Endorsement.

In his deposition, Dr. Steele testified as follows:

Q:   You understand that the only way for your umbrella coverage to continue into the next policy period was if Graham was excluded as a driver, correct?

A:   Correct.

Q:   And you wanted your umbrella policy to continue, correct?

A:   Correct.

Q:   So you authorized Progressive to write the umbrella policy for the next policy term, beginning in May, 2012, with Graham being excluded as a driver, correct?

A:   Correct.

(Steele Dep. Doc. # 27-1 at 10-11).   Given Dr. Steele's understanding and affirmative authorization for Progressive to write a policy excluding his son, Graham, the Court finds that requiring any further means of "asking" on the part of Dr. Steele in order to exclude a driver under the Policy would constitute an unreasonable construction of the Named Driver Exclusion Endorsement.

As for Murphy-Smith's argument that a genuine dispute of material fact exists as to "whether Dr. Steele asked Progressive to exclude his son Graham from coverage," (Doc. # 33 at 4), because Dr. Steele testified that "Progressive

excluded him.   I didn't ask them to exclude him," (Id.) (citing Steele Dep. Doc. # 27 at 13), the Court disagrees. Rather, in the Court's view, this comment by Dr. Steele relates to the events surrounding his receipt of the non-renewal notice, not to the events surrounding Dr. Steele's authorization of the renewed Policy effective May 10, 2012.

It is true that Progressive initially determined that the umbrella policy could not be renewed due to Graham Steele's driving record, and that Dr. Steele did not "ask" Progressive to arrive at this determination.   However, as Dr. Steele's above testimony reveals, Dr. Steele had a choice as to whether he should continue his umbrella policy with Progressive in light of Progressive's unwillingness to extend coverage to Graham.   Rather than, for instance, choosing to pursue umbrella coverage with a different insurance company that might have extended coverage to Graham, Dr. Steele instead chose to authorize Progressive to write a policy excluding Graham from coverage.   It was this authorization, and not Progressive's decision to issue the non-renewal notice due to Graham's driving record, that fulfilled the "asking" requirement of the Named Driver Exclusion Endorsement.

Furthermore, to the extent Dr. Steele argues that he

interpreted Graham's exclusion to mean that "if [Graham] gets in an accident his auto insurance will cover him, the umbrella will not. . . . However, if somebody came for a claim after me, my umbrella would still be acceptable," (Steele Dep. Doc. # 27-1 at 8), the Court finds that the plain language of the Named Driver Exclusion Endorsement belies this interpretation. Indeed, the Named Driver Exclusion Endorsement states not only that Progressive would "not provide coverage for *any claim* arising from an accident or loss involving a motorized vehicle being operated by th[e] excluded driver," but also that "[t]his includes *any claim for damages made against you, a relative, or any other person or organization* that is vicariously liable for an accident arising out of the operation of a motorized vehicle by the excluded driver." (Policy Doc. # 26-3 at 9) (emphasis added).

Dr. Steele does not dispute that he received a copy of the Policy, including this language, by mail from Progressive. (See Steele Dep. Doc. # 27-1 at 2-3). Additionally, Dr. Steele concedes that, when he received the Policy in the mail from Progressive, he did not review the

Policy.[3]  (Id. at 3).

After reading the Named Driver Exclusion Endorsement aloud in his deposition, Dr. Steele testified as follows:

> Q:   Okay.  Is it your understanding by reading that Named Driver Exclusion Endorsement that if an accident is caused by someone who was excluded under the policy – your son – that you would not have any coverage under the policy?
>
> A:   Yes.
>
> Q:   Okay. Did you read that particular endorsement when you received the policy?
>
> A:   No.
>
> Q:   And that's because you didn't read the policy at all, correct?
>
> A:   Correct.
>
> Q:   Okay.  And had you read that endorsement you would have known that you were excluded from coverage under the policy if an accident was caused by your son, Graham, driving one of your vehicles?
>
> A:   Correct.

(Steele Dep. Doc. # 27-1 at 4-5).

The Court is mindful that, in the insurance context, "an insured has a duty to take certain steps for its own protection such as reading their policies, certificates of

---

[3] Dr. Steele also testified that he assumed his son would be excluded under the Policy based on his conversations with Clegg.  (Steele Dep. Doc. # 27-1 at 3).

insurance or any cancellation notices in their possession."
Admiral Ins. Co. v. Crescent Hills Apts., 328 F.3d 1310, 1312
(11th Cir. 2003).   "[A] reasonable person has no right to
shut his eyes or ears to avoid information, and then say he
has no notice . . . . Similarly, an insured cannot avoid
liability for a provision in an insurance [policy] he claims
he did not read."   Citizens Prop. Ins. Co. v. European
Woodcraft & Mica Design, 49 So. 3d 774, 777-78 (Fla. 4th DCA
2010).

    To that end, the Court finds that Dr. Steele's contention
that he misunderstood the implications of excluding Graham
Steele under the Policy fails to create a genuine issue of
material fact that might prevent the entry of summary judgment
in this case.   To the contrary, Dr. Steele's testimony
demonstrates that an individual upon reading the Named Driver
Exclusion Endorsement would conclude that the Policy affords
no coverage to Dr. Steele for a claim arising from an accident
involving Graham Steele.

    Murphy-Smith additionally argues that, since Dr. Steele
testified that he does not recall signing the exclusion form
(Steele Dep. Doc. # 37 at 5), and Clegg has testified that he
cannot locate the exclusion form (Clegg Dep. Doc. # 42 at 10;
Errata Sheet Doc. # 29 at 5), "there remains a genuine dispute

as to whether a signed copy of the form was in fact secured by Mr. Clegg from Dr. Steele." (Doc. # 33 at 5). The Court disagrees.

Progressive's Product Analyst, Brian Dedrick, submitted an affidavit stating that

> Pursuant to Progressive's producer agreement with its agents, in order to exclude a named driver from coverage, the agent is required to secure a signed copy of the Named Driver Exclusion Election from the policyholder and maintain a copy of it in their files. *Progressive does not require that the original signed Named Driver Exclusion Election, or a copy thereof, be provided to Progressive in order to exclude a driver from coverage.*

(Dedrick Aff. Doc. # 26-1 at 4) (emphasis added). Accordingly, Clegg's indication to Progressive that he obtained the necessary exclusion form from Dr. Steele was sufficient for Progressive to write the Policy excluding Graham from coverage. Murphy-Smith has failed to introduce any evidence contesting this fact.

Instead, Murphy-Smith points to the requirement that a Progressive agent must "maintain a copy of [the exclusion form] in their files," as an indication that "the second requirement of Progressive for exclusion from coverage was not met, in that Mr. Clegg has not maintained a signed copy of the form in his files." (Doc. # 33 at 5). However, the record reveals that Clegg did indeed "obtain a copy of the

[driver exclusion form,] which I have misplaced." (Errata Sheet Doc. # 29 at 5). Additionally, Dr. Steele does not contest that he signed such a form at Clegg's request, but merely testified as follows:

> Q:  Okay. Was there ever a time when either Mr. Clegg sent to you in the mail or met with you in person with some documents for you to sign addressing this nonrenewal matter?
>
> A:  Very likely.
>
> *   *   *
>
> Q:  Do you recall signing any particular documentation or paperwork or form as you sit here today?
>
> A:  No.
>
> Q:  All right. Would I best be – should I probably ask Mr. Clegg those questions? Would you think he might know?
>
> A:  He might.

(Steele Dep Doc. # 37 at 5-6). Accordingly, the Court finds that Murphy-Smith's characterization of this testimony, that Dr. Steele simply "testified in his deposition that he does not recall signing any particular documentation or paperwork or form," is not wholly accurate given the context of this statement. (Doc. # 33 at 5).

Rather, when asked whether Clegg mailed to Dr. Steele or met in person with Dr. Steele for the purpose of signing

certain documents addressing the non-renewal notice, Dr. Steele replied that this was "very likely." (Steele Dep Doc. # 37 at 5). However, when asked more narrowly whether Dr. Steele could remember the particular documentation he signed, Dr. Steele replied that he could not recall, but indicated that Clegg might know. (Id. at 5-6). Indeed, Clegg does claim to recall the answer to this question and unequivocally indicates that he successfully obtained a signed copy of the exclusion form from Dr. Steele. (See Clegg Dep. Doc. # 42 at 9). The Court therefore finds that this testimony does not create a genuine dispute of material fact in this case, especially in light of the Court's determination that Clegg's indication to Progressive that he obtained the necessary exclusion form from Dr. Steele was sufficient for Progressive to write the Policy excluding Graham from coverage.[4]

Finally, Murphy-Smith argues that "a genuine dispute of

---

[4] The Court acknowledges the argument in Progressive's reply that Dr. Steele may not have signed every page of the Policy effective May 10, 2012, because the Policy was "direct billed," which means that the Policy was effectively renewed using the billing information on file with the carrier, and thus that the insured would not necessarily have to "physically" renew the policy or execute a written document to exclude a driver. Because the Court finds for the reasons stated above that Murphy-Smith's argument on this point does not create a genuine issue of material fact, the Court declines to analyze this issue further.

material fact exists as to whether all necessary parties for
the 'asking' to exclude as required by the Named Driver
Exclusion Endorsement joined in (sic)," because there is no
evidence that Dr. Steele's wife asked for Graham to be
excluded under the Policy.  (Doc. # 33 at 6).  To support
this argument, Murphy-Smith states:

> The word "you" as defined in the Definitions
> section of the subject Personal Umbrella Policy .
> . . states that . . . "You" and "Your" mean: [1.]
> a person shown as a named insured on the
> declarations page; and [2.] the spouse of a named
> insured if residing in the same household.  Dr.
> Steele testified in his deposition that his wife,
> Leah, lives with him . . . . In that deposition,
> Dr. Steele also testified that his wife definitely
> did not ask Progressive to exclude Graham.

(Doc. # 33 at 6) (quoting Doc. # 1-2 at 5).

In response to this argument, Progressive directs the
Court to another provision of the Policy, labeled "Joint and
Individual Interests."   (Doc. # 34 at 8).   That section
provides as follows:

> If there is more than one named insured on this
> policy, any named insured may cancel or change this
> policy.  The action of one named insured will be
> binding on all persons provided coverage under this
> policy.

(Pers. Umbrella Policy Doc. # 1-2 at 15).  As "Dr. Paul
Steele" is listed as the only "named insured" under the Policy
(Policy Doc. # 26-3 at 3), the Court finds that Dr. Steele's

act of authorizing Progressive to write the Policy with Graham as an excluded driver constitutes the only authorization necessary to properly effectuate that exclusion.

In accordance with these findings, the Court determines that the Policy effective May 10, 2012, afforded no coverage to Dr. Steele or Graham Steele for any claim for damages arising out of the operation of a motorized vehicle by Graham Steele, an excluded driver. "Where the alleged facts and legal theories do not fall within a policy's coverage, no duty to defend arises." Mt. Hawley Ins. Co. v. Dania Distrib. Ctr., Ltd., 763 F. Supp. 2d 1359, 1364 (S.D. Fla. 2011) (internal quotation omitted). Correspondingly, "[a]n insurer has no duty to indemnify when it has no duty to defend the insured." Id. Accordingly, in light of the Court's determination that the Policy afforded no coverage to Dr. Steele or Graham Steele for any claim for damages arising out of the operation of a motorized vehicle by Graham Steele, the Court finds that Progressive has no duty to defend the Steeles in connection with the September 12, 2012, Accident. In the absence of a duty to defend, Progressive likewise has no duty to indemnify the Steeles under the Policy. The Court thus grants Progressive's Motion for Summary Judgment in accordance with these findings.

26

## IV.  **Defaulted Defendants**

As previously noted, Dr. Steele and Graham Steele have failed to appear in this action, and that failure has resulted in the entry of a Clerk's default as to both of these Defendants.  (Doc. ## 14, 15).  Although resolving a Motion for Final Default Judgment would have been inappropriate prior to the Court's ruling on the instant Motion for Summary Judgment as to the remaining Defendant, Murphy-Smith, the time has come for Progressive to proceed without delay in seeking final default judgment as to Defendants Paul Steele and Graham Steele.  The Court accordingly directs Progressive to move for default judgment or alternatively to dismiss Defendants Paul Steele and Graham Steele within seven days of the date of this Order.

Accordingly, it is

**ORDERED**, **ADJUDGED**, and **DECREED**:

(1)  Plaintiff Progressive American Insurance Company's Motion for Entry of Final Summary Judgment (Doc. # 26) is **GRANTED.**

(2)  The Clerk is directed to enter Judgment in favor of Plaintiff Progressive American Insurance Company and against Defendant Dorothy Mae Murphy-Smith.

(3)   Plaintiff shall move for default judgment or dismiss Defendants Paul Steele and Graham Steele within seven (7) days of the date of this Order.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 18th day of April, 2014.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All Counsel of Record